```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------X
THE MARTHA GRAHAM SCHOOL AND
DANCE FOUNDATION, INC. and RONALD
A. PROTAS, individually and as
Trustee of the Martha Graham Trust

  Plaintiffs-Counterclaim Defendants,    01 Civ. 271 (MGC)

        - against -                      FINDINGS OF FACT AND
                                         CONCLUSIONS OF LAW
MARTHA GRAHAM CENTER OF
CONTEMPORARY DANCE, INC. and MARTHA
GRAHAM SCHOOL OF CONTEMPORARY DANCE,
INC.

  Defendants-Counterclaim Plaintiffs,

        - and –

ELIOT SPITZER, ATTORNEY GENERAL OF
THE STATE OF NEW YORK,

              Intervenor-Defendant.
-------------------------------------X

APPEARANCES:

        JUDD BURSTEIN, P.C.
        Attorneys for Plaintiffs-Counterclaim Defendants
        1790 Broadway
        New York, NY 10019

        By:  Judd Burstein, Esq.
             Peter B. Schalk, Esq.
             Alexander M. Levy, Esq.

        CRAVATH, SWAINE & MOORE LLP
        Attorneys for Defendants-Counterclaim Plaintiffs
        Worldwide Plaza
        825 Eighth Avenue
        New York, NY 10019-7475

        By:  Katherine B. Forrest, Esq.
             Michael Reynolds, Esq.
             Joanne M. Gentile, Esq.
             Robert Simonds, Esq.

                        1
```

ELIOT SPITZER, ATTORNEY GENERAL
OF THE STATE OF NEW YORK
Attorneys for Intervenor-Defendant
120 Broadway
New York, New York 10271

By: Gerald A. Rosenberg, Esq.
    Barbara L. Quint, Esq.

**CEDARBAUM, J.**

The central dispute in the second phase of this lawsuit was ownership of copyrights in 70 dances created by the great dancer, choreographer and teacher, Martha Graham at the time of her death in 1991. In an opinion dated August 23, 2002 following a bench trial, I held that defendants Martha Graham Center of Contemporary Dance, Inc. (the "Center") and Martha Graham School of Contemporary Dance, Inc. (the "School") owned copyright in 45 of the 70 dances. <u>Martha Graham School and Dance Foundation, Inc. v. Martha Graham Center of Contemporary Dance, Inc.</u>, 224 F. Supp.2d 567 (S.D.N.Y. 2002) ("<u>Graham II</u>" or the "copyright trial"). The Second Circuit affirmed the judgment in large part and issued a partial remand limited to three specific issues. <u>Martha Graham School and Dance Foundation, Inc. v. Martha Graham Center of Contemporary Dance, Inc.</u>, 380 F.3d 624 (2d Cir. 2004) ("<u>2d Cir. Graham II</u>"). First, the Court of Appeals vacated the judgment that seven unpublished works created by Graham between 1956 through 1965 — *Embattled Garden, Episodes: Part I, Phaedra, Secular Games, Legend of Judith, The Witch of Endor,* and *Part Real-Part Dream* — were works made for hire, and remanded for a determination as to "whether Graham assigned any of these seven works to the Center, or whether they passed to [plaintiff Ronald] Protas", the sole executor and legatee under Graham's will,

3

"through Graham's residuary estate." 2d Cir. Graham II, 380 F.3d at 639; see also id. at 647.

Second, the Court of Appeals affirmed the ruling that the dance *Frescoes* is an unpublished work made for hire belonging to the Center, but, noting a reference to "Duets from Frescoes" on a 1990 list of "Films with Producers Unknown", remanded the question "whether (1) *Duets* is a distinct dance within the dance *Frescoes*, and (2) if so, whether *Duets* was published with the requisite notice." Id. at 642; see also id. at 642 n.38, 645, 647.

Third, the Court of Appeals vacated the judgment that *Tanagra* was an unpublished work and remanded for a determination of copyright ownership of that dance. Id. at 645, 647.[1]

Based on the evidence received at the two previous trials in this case and detailed in my earlier opinions, see Martha Graham School and Dance Foundation, Inc. v. Martha Graham Center of Contemporary Dance, Inc., 153 F. Supp.2d 512 (S.D.N.Y. 2001) ("Graham I"), aff'd, 43 Fed. Appx. 408 (2d Cir. 2002); Graham II,

---

[1] The Court of Appeals also remanded "for a recalculation of the amount subject to the constructive trust" that was imposed on proceeds from Protas' licensing and sale of defendants' property, "in light of the findings the District Court will make on remand in determining ownership of [the] nine dances" enumerated above. 2d Cir. Graham II, 380 F.3d at 646-47. As no fees were awarded to the Center for use of the choreography of any of the nine dances on remand, no recalculation of the principal in the constructive trust was necessary. Accordingly, and without objection, plaintiffs were directed by Order dated March 29, 2005 to pay the Center $282,462.44.

4

224 F. Supp.2d 567, and based on the evidence received at a short evidentiary hearing held on May 18 and 20, 2005, I make the following findings of fact and conclusions of law in accordance with Fed. R. Civ. P. 52(a).

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

I. *Tanagra*

With respect to the choreography of *Tanagra*, both sides agree that *Tanagra* was published in the 1920s without the requisite copyright notice. Accordingly, it is undisputed that *Tanagra* is in the public domain.

II. *Frescoes*

With respect to *Frescoes*, a preponderance of the credible evidence shows that there is no distinct dance within *Frescoes* and there is no dance called *Duets*.

As part of the "Kennedy Center Honors", a televised program at the Kennedy Center in 1979 honoring Martha Graham and referred to in the 1990 list of "Films with Producers Unknown" about which the Court of Appeals inquired, some of the duets from Graham's then newest work "*Frescoes*" were performed. Christine Dakin, a dancer with the Martha Graham Dance Company (the "Dance Company") between 1976 and 2000 who performed in *Frescoes* many times, testified credibly at the evidentiary hearing that the performance at the Kennedy Center was an excerpt from the dance *Frescoes*, and that there is no ballet entitled *Duets*. No such

5

dance appears on the list of works in "The Martha Graham Repertoire", a document agreed to by both sides as a chronological list of the dances created by Graham. See Graham II, 224 F. Supp.2d at 585 n.9, 605 n.12.

Dakin's testimony is confirmed by my viewing of the Kennedy Center performance, a CD-ROM of which was received in evidence at the evidentiary hearing. The recording shows that the word "duets" does not appear on any portion of the performance. The dance is referred to throughout as *Frescoes.* Gene Kelly, who introduced the performance, remarked: "Now, [Graham's] newest work is called *Frescoes*, from Samuel Barber's opera 'Antony and Cleopatra'. Peggy Lyman and Tim Wengerd from Martha's company will dance to Cleopatra's dying aria, 'Give Me My Robe', as sung by Leontyne Price." Credits at the end of the program include "Costumes for '<u>Frescoes</u>' by Halston". (Emphasis added.)

Additionally, my viewing of the dance *Frescoes* performed in its entirety, a CD-ROM of which was also received in evidence at the evidentiary hearing, shows that the word "duets" is descriptive of the nature of the dancing in *Frescoes*. As Dakin testified, "[d]uets . . . made up the dance" *Frescoes*, "alternating duet, duet, group, duet, group". In this regard, "Duets from Frescoes" is an apt description of the 1979 "Kennedy Center Honors" performance to which the entry on the list of "Films with Producers Unknown" refers.

6

It is clear from all of the evidence that there is no separate dance called *Duets*. It is also clear that the copyright in the portion of *Frescoes* that was published in 1979 as part of the "Kennedy Center Honors" is property of defendants. The following copyright notice appears at the end of the recording: "Copyright © 1979 Kennedy Center Television Productions, Inc." This notice is sufficient to preserve defendants' copyright in the excerpt from *Frescoes* that was published in the "Kennedy Center Honors" television broadcast. See 2d Cir. Graham II, 380 F.3d at 645; Goodis v. United Artists Television, Inc., 425 F.2d 397, 403 (2d Cir. 1970).

**III. *Embattled Garden, Episodes: Part I, Phaedra, Secular Games, Legend of Judith, The Witch of Endor,* and *Part Real-Part Dream***

With respect to the seven unpublished dances created by Graham from 1956 through 1965 – *Embattled Garden* (1958), *Episodes: Part I* (1959), *Phaedra* (1962), *Secular Games* (1962), *Legend of Judith* (1962), *The Witch of Endor* (1965), and *Part Real-Part Dream* (1965) – defendants have shown by a preponderance of the credible evidence that Graham assigned the choreography of these dances to the Center.

As with the ballets Graham created prior to the incorporation of the School in 1956, there is no writing in evidence memorializing Graham's assignment of copyright in the

7

seven unpublished dances created from 1956 through 1965. However, "assignments of common law copyright need not be in writing", 2d Cir. Graham II, 380 F.3d at 643, but can "be oral or inferred from conduct." Graham II, 224 F. Supp.2d at 596 (quoting Jerry Vogel Music Co. v. Warner Bros., Inc., 535 F. Supp. 172, 175) (S.D.N.Y. 1982)); see also Houghton Mifflin Co. v. Stackpole Sons, Inc., 104 F.2d 306, 311 (2d Cir. 1939).

Much of the same evidence that established Graham's assignment of her pre-1956 works also evidences her assignment to the Center of the seven unpublished dances created between 1956 through 1965. See generally Graham II, 224 F. Supp.2d at 597-600. For example, in September 1968, LeRoy Leatherman, Executive Administrator of the Center, denied a request by Benjamin Harkarvy, the director of the Netherlands School, to perform Graham's dances. In his letter denying the request, Leatherman stated:

> Recently Miss Graham assigned performing rights to all of her works to the Martha Graham Center of Contemporary Dance, Inc. . . . and the decision to grant such rights rests now exclusively with the Center's Board of Directors. The members of the Board, in planning for the future of the Martha Graham Dance Company, are now discussing what policy will be adopted in regard to performing rights to other Companies. . . .
>
> Miss Graham deeply regretted that she was unable to attend your recent New York season and asks me to send you her congratulations and her greetings.

Leatherman had been the principal managerial employee of the defendants and a member of the board of directors of the School

8

from its founding in 1956 to 1972. Jeannette Roosevelt, who served as a member of the Center's board of directors from 1965 or 1966 until January 1973, and as President of the Center and of the School from 1968, testified credibly at the copyright trial that Leatherman was very loyal to Graham and was concerned that her wishes be met. She recalled that Mr. Harkarvy's request to perform the dances had been denied.

In February 1971, Leatherman wrote a letter on behalf of Graham to Linda Hodes, previously a principal dancer with the Dance Company, denying Hodes' request to perform the Graham dances while she was at the Netherlands Dance Theater. In the letter, Leatherman stated:

> Martha has asked me to answer a part of your letter to her, dated June 30th. . . .
>
> About the Netherlands Theatre and the works: Martha has assigned all rights to all of her works to the Martha Graham Center, Inc. She did this for two reasons: To be sure that some responsible control would be exercised over them in the future and so that someone other than she would take the responsibility now for saying yes or no to the requests that are coming in from all directions. The Board of Directors is now faced with formulating a firm policy about the works and what is to happen to them.

Hodes, who was closely associated with Graham and the defendants since the early 1950s, testified credibly at the copyright trial that she received such a letter written on Center letterhead and signed by Leatherman. Hodes first met Graham in 1940 and continued to interact with Graham until her death, having "daily conversations" with Graham. In her last will, Graham requested that Protas consult with her friends, among whom she listed Linda Hodes first.

Jeannette Roosevelt's testimony at the copyright trial also supports a finding of assignment. By using Roosevelt's deposition in questioning her at trial, plaintiffs established that it was Roosevelt's understanding that Graham had given the choreographic works to the Center prior to the time that she became a board member in 1965 or 1966. Roosevelt knew about this transfer because it was "part of the board's understanding" and because the board "had records in which [Graham] had given the materials to the board." Roosevelt further testified that "it was [the board's] assumption that whenever dances were created they would become works that the board was responsible for. It was a continuation of the situation that had come about when [Graham] gave the works to the board." Roosevelt was a credible and forthcoming witness at the copyright trial.

9

In April 1973, Ronald Protas wrote a letter to Arnold Weissberger, a Center board member and Graham's personal attorney, stating that Protas was making arrangements to have a work film made of the dance *Secular Games*, among others, and that he would be "grateful if we could draw up a contract between the Center and the photographer . . . stating that we retain all rights to these films". The "we" referred to was the Center.

Defendants also presented a report of Stuart Hodes, a principal dancer with the Dance Company from 1947 to 1958 who later taught at the School and worked to help it gain accreditation. As part of that accreditation process, Hodes submitted the report to the Center's board of trustees, which was received in evidence at the copyright trial, listing "Works by Martha Graham" as a resource of the Center.

Finally, in 1974, Edmund Pease, Treasurer and member of the Center's board of directors, with the aid of the accounting firm Lutz and Carr, undertook a "thorough study" of the commingling of the assets belonging to the Center and to Graham with the purpose of determining what belonged to whom. According to Pease, who was himself a certified financial analyst, his examination of documents dating back to 1948 revealed that dance royalties had been paid to the Center and that the Center had borne the expense of creating the sets and costumes. Pease testified credibly at the copyright trial that the "background ledgers" he studied showed that prior to 1974, the dances, sets, and costumes had been listed as assets on the defendants' financial statements.

Pease personally presented his findings to Graham's attorney, Arnold Weissberger, who expressed no disagreement with the findings and who stated that Graham did not want to own any of the assets because they would complicate her estate planning. The study's final report concluded that the Center's assets included the dances, sets, and costumes, and recommended that these items be carried on the Center's balance sheet as assets at nominal value. Pease personally submitted this report to Graham, who did not express any disagreement with the report's findings. Pease thereafter presented the report to the Center's board of directors while Graham was present. Francis Mason, member and Chairman of the Center's board of directors at that time, testified credibly at the copyright trial that the board approved Pease's report. The report and the board minutes pertaining to this period have been lost or destroyed. Pease was a forthcoming and credible witness at the copyright trial.

Additional documents, testimony and stipulations were received at the evidentiary hearing which showed that defendants consistently acted as the copyright proprietors of the seven unpublished dances created from 1956 through 1965 with Graham's agreement. For example, defendants introduced contracts entered into by the Center for performances of Graham's dances by the

Dance Company. At the evidentiary hearing, plaintiffs agreed that these contracts included performances of the seven unpublished dances created from 1956 through 1965.

In a February 3, 1972 letter, LeRoy Leatherman contacted the Julliard School to ask if it wished to be considered by the Center's board of directors as a potential recipient of all of Graham's works and related property. In the letter, Leatherman explained:

> The first week in March the Martha Graham Center's Board of Directors will meet for its annual meeting. It is apparent that the future of the Martha Graham Dance Company, the Martha Graham School, the Martha Graham repertory and all theatrical and musical properties necessary to it and the archives, including all film records, will be discussed and decided upon at this meeting.
>
> At present, I am preparing a list of the courses of action which are open to us. Among these is the direct transfer of the entire complex, with all rights and privileges pertaining thereto, to an academic institution where the teaching of the Martha Graham technique is already well established.

Defendants also presented evidence that in November 1974, Center board member Arnold Weissberger wrote to the Batsheva Bat-Dor Dance Society in Israel to terminate "all licenses to perform Martha Graham works". Linda Hodes, a founding member of the Batsheva dance company, testified that among the Martha Graham works the company had performed prior to 1974 was *Embattled Garden*. In a letter dated December 8, 1974, Barry Swersky of the Batsheva dance company wrote back to Weissberger asking for "further particulars as to what is intended by your words – 'I am notifying you of the termination of all licenses to perform Martha Graham works'". Weissberger forwarded Swersky's response to Protas under cover of letter dated December 17, 1974. Weissberger wrote:

> I think that what I should write [Swersky] is that the Board of Directors is now engaged in re-formulating the conditions under which Martha Graham works will be licensed, and until such time as a final comprehensive plan is reached, we do not wish Martha Graham works performed.

Weissberger copied Martha Graham on his December 17, 1974 letter to Protas.

Following Weissberger's original notice to the Batsheva dance company, Protas sent a telegram to Linda Hodes in Israel

11

reiterating that "the Batsheva company has no right to perform the Graham Company works until they renegotiate permission from the Center[.] Since Batsheva had been notified by our attorney Arnold Weissbe[r]ger that all rights had terminated we have had no word from the Batsheva company about renegotiating".

Additionally, Christine Dakin testified at the hearing that she performed in *Embattled Garden*, *Episodes: Part I*, *Phaedra* and *Secular Games* during Graham's lifetime, and that in learning the choreography of those dances and preparing for her roles, she used rehearsal tapes of the dances and materials in the Center's archive with Graham's encouragement. Similarly, Janet Eilber, who performed with the Dance Company throughout the 1970s and danced in *Episodes: Part I* ten or fifteen times, testified at the hearing that in reconstructing *Episodes: Part I* in the late 1970s, photographs of Graham's performance were used "to remember the movement and recreate it." Eilber, now Artistic Director of Martha Graham Resources, a department of the Center, further testified that the photographs of the seven dances received in evidence were not segregated from other photographs at the Center, and that she did not have to ask Graham's permission to use photographs of any of the seven works during Graham's lifetime.

Eilber also testified that she first performed the dance *Secular Games* in 1972 during the Center's "apprentice program", in which the Center brought together apprentice dancers and Dance Company members "to reconstruct as many of [Graham's] works as possible in a four-month period and document them." As part of this program, Eilber was paid by the Center. Both Dakin and Eilber were credible witnesses at the evidentiary hearing.

Finally, Center board meeting minutes dated May 3, 1979 suggest that the Center bore the expense of recreating *Episodes: Part I* in the late 1970s. Graham, who was present at the meeting, stated that "[s]he had started work on her revival/re-creation of 'Episodes' which she planned to premiere in London this summer." A "Fact Sheet on London Costs" following the minutes contains a line item for "Episodes, revival costs -- $67,000".

Plaintiffs attempt to refute evidence that *Episodes: Part* I was assigned to the Center by introducing a contract dated April 16, 1959 between Martha Graham in her personal capacity and the Ballet Society, Inc. The contract provides in relevant part as follows:

> WHEREAS the [Ballet Society] is desirous of and prepared to produce a ballet entitled EPISODES using music of Anton Webern, and whereas the [Ballet Society] is desirous of engaging the services of [Martha Graham] to provide a portion of the choreography for said work, the rest of which choreography will be provided by

12

> George Balanchine, and to stage this work for The New
> York City Ballet, now therefore, in consideration of
> the foregoing, it is mutually agreed as follows: . . .
>
> 4. [Martha Graham] grants to the [Ballet Society]
> exclusive rights to her portion of the choreography of
> EPISODES for a period of three years from the date of
> the first public performance, except that if fewer than
> ten public performances of the work are given in any
> year the rights become non-exclusive.

Janet Eilber testified at the evidentiary hearing that the Graham and Balanchine pieces were presented together in 1959 at the New York City Ballet, and that *Episodes: Part I* was the piece choreographed by Graham.

Although Graham may have entered into this contract in her own behalf in 1959, what matters is who owned the copyright in the choreography of *Episodes: Part I* at the time of Graham's death in 1991. Nothing in the contract precludes an assignment of the work by Graham to the Center after 1962. On the contrary, among the substantial evidence of Graham's assignment of the seven dances to the Center, board meeting minutes from 1979 show that the Center bore the expense of recreating *Episodes: Part I* in the late 1970s.

Plaintiffs also introduced a playbill from the Dance Company's 1988 season at the City Center Theater in which the notice "*Choreography copyright* 1976 by Martha Graham" appears for the ballet *Embattled Garden*. Janet Eilber testified at the evidentiary hearing that programs are usually "very quickly and sloppily done" and that there were instances in which there were errors in the programs she inspected. Notably, the same playbill on which plaintiffs rely contains a copyright notice in Graham's name for the ballet *Appalachian Spring* as well as a note that the dance was "[c]ommissioned for Martha Graham by the Elizabeth Sprague Coolidge Foundation". The Second Circuit affirmed my finding that *Appalachian Spring* was a commissioned work first published in 1959 that entered the public domain for lack of renewal. <u>2d Cir. Graham II</u>, 380 F.3d at 637 n.26.

Finally, plaintiffs also introduced several documents at the evidentiary hearing that refer to "royalties" or "fees" purportedly paid to Graham. For example, documents dated 1966 from the B. De Rothschild Foundation reflect itemized expenses for "fees" to Martha Graham for "use of works and choreography" in connection with the foundation's sponsorship of the "Martha Graham 1965 Broadway Season", during which six of the seven remanded dances were performed. Plaintiffs argue that Bethsabee de Rothschild – for whom the B. de Rothschild Foundation was

13

named and who was President of the Center's board of directors as of December 12, 1965 – "would have known if Graham had assigned the remanded ballets to the Center." If Graham had made such an assignment in 1965 or earlier, plaintiffs argue, the foundation would not have paid Graham a fee for the use of her works and choreography.

As with the 1959 Ballet Society contract, however, nothing in the B. de Rothschild Foundation documents precludes an assignment of the six remanded dances performed during the 1965 Broadway season to the Center at some later date. In any event, as with the documents plaintiffs introduced with respect to royalties for Graham, plaintiffs offer no evidence as to what the payments represented. As defendants point out, such payments, by themselves, do not necessarily evidence ownership of copyright: a 1966 writing "assign[ing], transfer[ing] and set[ting] over to [the Center], absolutely and forever, all [Graham's] right, title and interest, present and future, in and to" two new choreographic works funded by the National Endowment for the Arts, for example, nevertheless provided that Graham would be paid "choreographer's fees" by the Center totaling $6,000.

Nor have plaintiffs presented persuasive evidence to rebut the preponderance of credible evidence showing that Graham was never actually paid royalties by defendants. Plaintiffs point to a notation – "Pd. 12-28-70 #668" – on a document entitled "Martha Graham Royalties" that was handwritten by a source neither side could identify, together with a corresponding check register entry to show that royalties were in fact paid to Graham for performances of *Phaedra*, among other dances, in 1970. However, Francis Mason, who became a Center board member in 1974, testified credibly at both the copyright trial and the evidentiary hearing that he did not recall Graham ever actually being paid royalties. Michele Etienne, who was hired by Protas in 1973 and who served as the Center's business manager until 1998, testified credibly on cross-examination at the first trial that during her employment with defendants, no royalty payments were made to Graham. Edmund Pease testified at the copyright trial that the historical records of the defendants showed that royalties were paid to the Center.

The preponderance of the credible evidence shows that Graham assigned copyright in the choreography of the seven unpublished dances created from 1956 through 1965 to the Center. Furthermore, Graham received consideration for the assignment of these works in that, as the Court of Appeals summarized, she "benefitted from the Center's assumption of the legal and financial duties associated with her choreography; assigning to the Center the copyrights in her dances gave her what she wished – freedom from the responsibilities of copyright registration and renewal, licensing, collection of royalties, and archival tasks."

14

2d Cir. Graham II, 380 F.3d at 644. The assignment of common law copyright in the seven dances was thus founded on valid consideration between Graham and the Center, and the works are property of defendants. See id. (citing Risley v. Phenix Bank, 83 N.Y. 318, 328 (1881)).

**CONCLUSION**

For the foregoing reasons, I answer the questions of the Court of Appeals as follows:
1. The dance *Tanagra* is in the public domain.
2. There is no distinct dance within *Frescoes* and there is no dance called *Duets*. The copyright notice appearing at the end of the "Kennedy Center Honors" television broadcast is sufficient to preserve defendants' copyright in the excerpt from *Frescoes* that was published in the broadcast.

3. A preponderance of the credible evidence shows that the common law copyrights in the seven unpublished dances created from 1956 through 1965 – *Embattled Garden, Episodes: Part I, Phaedra, Secular Games, Legend of Judith, The Witch of Endor,* and *Part Real-Part Dream* – were assigned to the Center by Martha Graham.

SO ORDERED.

Dated:    New York, New York
          June 23, 2005

                                                  S/_____
                                                  MIRIAM GOLDMAN CEDARBAUM
                                                  United States District Judge